**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WILLIAM FONNER; SAMUEL DURIE,
    *Plaintiffs-Appellants,*

v.

FAIRFAX COUNTY, VIRGINIA; JAMES
THUR, Executive Director, Fairfax-
Falls Church Community Services
Board; MARY W. KUDLESS, Deputy
Director, Fairfax-Falls Church
Community Services Board; ALAN
WOOTEN, Acting Director, Fairfax-
Falls Church Community Services
Board; ELLEN EINSTEIN, Acting
Residential Services Director,
Fairfax-Falls Church Community
Services Board; SYLVIA MCGILL,
Residential Program Coordinator,
Fairfax-Falls Church Community
Services Board,
    *Defendants-Appellees.*

No. 03-1068

WILLIAM FONNER; SAMUEL DURIE,
                    *Plaintiffs-Appellants,*

                    v.

FAIRFAX COUNTY, VIRGINIA; JAMES
THUR, Executive Director, Fairfax-
Falls Church Community Services
Board; MARY W. KUDLESS, Deputy
Director, Fairfax-Falls Church
Community Services Board; ALAN
WOOTEN, Acting Director, Fairfax-
Falls Church Community Services
Board; ELLEN EINSTEIN, Acting
Residential Services Director,
Fairfax-Falls Church Community
Services Board; SYLVIA MCGILL,
Residential Program Coordinator,
Fairfax-Falls Church Community
Services Board,
                    *Defendants-Appellees.*

No. 03-1408

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-02-486-A)

Argued: December 5, 2003

Decided: July 14, 2005

Before WIDENER, MICHAEL, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Widener wrote the opinion, in
which Judge Michael and Judge Shedd concurred.

**COUNSEL**

**ARGUED:** Harvey Shepherd Williams, HARVEY S. WILLIAMS ATTORNEY, Washington, D.C., for Appellants. Ann Gouldin Killalea, Assistant County Attorney, OFFICE OF THE COUNTY ATTORNEY, Fairfax, Virginia, for Appellees. **ON BRIEF:** David P. Bobzien, County Attorney, Peter D. Andreoli, Jr., Deputy County Attorney, OFFICE OF THE COUNTY ATTORNEY, Fairfax, Virginia, for Appellees.

---

**OPINION**

WIDENER, Circuit Judge:

Plaintiffs Samuel Durie and William Fonner, both mentally retarded adult men, brought this action against Fairfax County, Virginia and five Fairfax County officials, alleging violations of their constitutional rights and the Americans with Disabilities Act, 42 U.S.C. § 12132 (1995). Plaintiffs' claims arose from the decision of defendants to prohibit Fonner, a resident of a county group home, from visiting Durie at Durie's private home. After receiving a report from a court-appointed guardian ad litem, the district court dismissed Fonner from the action, finding that he was not a willing participant in the litigation. The district court granted summary judgment for the defendants on all of Durie's claims. Fonner's counsel appeals the district court's order dismissing Fonner from the case. Durie appeals the district court's order granting summary judgment for the defendants. For the reasons stated below, we affirm the orders of the district court as well as its judgment.

I.

William Fonner lived at the Essex House, a group home in Fairfax County operated by Fairfax County. Fonner works at Mount Vernon-Lee Enterprises, a nonprofit organization that provides Fonner with vocational training and day support.

Samuel Durie lived with his adult brother, Robert Durie. Until November 2002, Samuel Durie and his brother lived in Fairfax

County with Doris Burnette, an employee of Fairfax County Mental Retardation Services who was assigned to Essex House.

While working for Mental Retardation Services, Miss Burnette met Fonner. In 1996, Miss Burnette arranged for Fonner and Samuel Durie to meet and the two men became friends. Fonner and Durie began to spend time together at the Duries' home. Because neither Fonner nor Durie drove, Fonner relied on Miss Burnette and Durie's brother Robert to pick him up at the Essex House and take him to the Duries' home. Miss Burnette sometimes took Fonner to visit Samuel Durie during her work hours. Fonner spent some nights at the Duries' home. The staff at Essex House knew Miss Burnette occasionally took Fonner to visit Samuel Durie, but Miss Burnette did not obtain approval from anyone at Essex House for the visits.

On May 27, 2001, Fonner complained to Miss Burnette that he had been left alone in a county van for an hour while Victor Palermo, an Essex House employee, was inside another group home. Miss Burnette reported the incident to her supervisor, and took Fonner home to stay with her and the Duries that night. An investigation by Mental Retardation Services determined that Fonner's human rights had not been violated. The investigators' report also found communications problems between Miss Burnette and Palermo. The report noted that Miss Burnette had taken Fonner to her home for the night because Fonner was upset and that she did not notify her supervisor of her actions. The Mental Retardation Services report recommended that "in order to ensure that the professional relationship between staff and the consumer is not compromised, a defined protocol should be put into place and adhered to that addresses under what circumstances it is appropriate for consumers to visit with or at staff's homes." There is no evidence in the record that suggests the investigators who completed the report were aware that Miss Burnette lived with Samuel and Robert Durie.

After the report was issued, Alan Wooten, the director of Mental Retardation Services, decided to prohibit Essex House residents from visiting the homes of Essex House staff members. On June 22, 2001, Wooten met with Miss Burnette and her supervisor and explained that Fonner could no longer be taken to Miss Burnette's home. Wooten told Miss Burnette that Fonner and Samuel Durie could still meet at

Essex House or other locations. Miss Burnette relayed this information to Robert Durie.

On July 23, 2001, an Essex House counselor helped Fonner call Samuel Durie and arrange to meet him at a pizza shop the following Thursday. On Thursday, Durie's brother Robert picked Fonner up at Essex House. When Fonner returned that evening, he told Essex House staff members that Robert had stopped to buy spaghetti and then taken Fonner back to the Duries' home for dinner. On August 4, 2001, Miss Burnette took Fonner from Essex House and dropped him off at the Duries' home. On August 17, 2001, Fonner again visited the Duries' home to watch a football game. It is unclear from the record who took Fonner to the Duries' home that day. On August 18, 2001, Miss Burnette again took Fonner to the Duries' home for lunch.

On September 7, 2001, Robert Durie went to Mount Vernon-Lee Enterprises, where Fonner works during the day, and told the staff he was picking Fonner up to take him to see an attorney. A staff member found Fonner in the lunch room and asked him if he had any appointments that day. Fonner said he did not. The staff member then told Robert that he could not allow Fonner to leave because no prior appointment had been made and Robert was not an authorized visitor. Mental Retardation Services asked Fonner several times if he wanted to meet with a county human rights advocate or an attorney but Fonner stated that he did not want to meet with an attorney.

At some point, which is not clear from the record, Miss Burnette stopped working for Mental Retardation Services. On October 3, 2001, Alan Wooten issued a memo stating that Fonner was not to have any contact with Robert Durie or Doris Burnette. Wooten stated that he was concerned "Robert is attempting to involve William in his own complaint against [the county]." He stated that he viewed Robert Durie's actions as "exploitive of William's mental health status."

On October 18, 2001, without notifying any Essex House staff, Robert Durie and Samuel Durie's lawyer, Harvey Williams, boarded a van used to transport residents of the county's group homes. Williams spoke with Fonner and had Fonner sign a retainer agreement. Fonner did not receive a copy of the document and when he later told Essex House staff members what happened he did not know what he

had signed. Fonner later told the court-appointed guardian ad litem that he was afraid when Robert Durie and Harvey Williams boarded the van and spoke to him. On April 4, 2002, Fonner and Durie, both represented by Harvey Williams, brought the suit which is now appealed in the United States District Court for the Eastern District of Virginia.

On August 21, 2002, the defendants filed a motion to appoint a guardian ad litem for Fonner, arguing that there was evidence Fonner did not want to be involved in the lawsuit. The district court granted the motion and appointed a guardian ad litem on September 13, 2002. After the guardian ad litem submitted her report to the court, the defendants moved to dismiss Fonner from the lawsuit. Relying on the findings of the guardian ad litem, the district court determined that Fonner did not want to proceed with the litigation and granted the defendants' motion to dismiss.

After Fonner was dismissed, Durie gave notice to take the deposition of Fonner. The defendants moved for a protective order, arguing that the deposition could be harmful to Fonner, and the magistrate judge granted the motion. The district court affirmed the magistrate's order.

On March 4, 2003, the district court granted summary judgment for the defendants on all counts. Fonner, through his counsel, has appealed the district court's order dismissing Fonner from the case. Durie appealed from the district court's grant of a protective order preventing Fonner's deposition, and from the district court's order granting summary judgment for the defendants.

## II.

We first address the district court's dismissal of Fonner from the lawsuit and the entry of a protective order to prevent the taking of his deposition. Our review of legal questions, including applications of law to facts, is *de novo*. See *United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332, 334 (4th Cir. 1996). Factual findings are reviewed for clear error. *Maddux Supply Co.*, 86 F.3d at 334. The district court's entry of a protective order is reviewed

for abuse of discretion. *M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1992).

Fonner's counsel objects to Fonner's dismissal from the case on two grounds. First, he argues that the district court was not authorized to appoint a guardian ad litem under Fed. R. Civ. P. 17(c) absent a determination of incompetency by the Commonwealth of Virginia. Second, Fonner's counsel argues that the district court's decision was not supported by the facts.

We reject these arguments. First, Fed. R. Civ. P. 17(c) provides that the district court "shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person." Fed. R. Civ. P. 17(c). Nothing in the rule prohibits the district court from appointing a guardian ad litem to represent a person not previously adjudicated as incompetent through a state proceeding. Moreover, we have noted previously that "[t]he federal district court may, of course, appoint a guardian ad litem in its discretion" where the district court believes the appointment is in the infant or incompetent's interests. *Genesco, Inc. v. Cone Mills Corp.*, 604 F.2d 281, 285 (4th Cir. 1975).

Indeed, this court has previously appointed a guardian ad litem to advise the court on a litigant's competency in as serious a fact situation as might be imagined. In *Lucas v. McKellar*, No. 95-4009 (4th Cir. Dec. 27, 1995), a death row inmate moved to forego his remaining appeals in order that he be executed. The court appointed a guardian ad litem to consider the inmate's competency and assist in determining what action this court should take on the inmate's motion. There is no reason to prohibit the district court from appointing a guardian ad litem in similar circumstances simply because the State has not made a determination of competency. Thus, we find it entirely appropriate that the district court, recognizing that Fonner suffered from some degree of mental retardation, appointed a guardian ad litem to assist the court in determining the propriety of Fonner's continued participation in the litigation.

Fonner's counsel next argues that the district court's dismissal of Fonner was not supported by the facts. Even though the record indi-

cates that Fonner made statements indicating his desire to bring a lawsuit, the record also shows that Fonner made equally or more prohibitive statements indicating that he did not want to bring suit. The guardian ad litem, Denise Tassi, filed her report with the district court. The first part of that report is worth repeating here:

> During the investigation of this matter, I interviewed the following: the named-plaintiffs William Fonner and Samuel Durie; their attorney Harvey S. Williams; Robert Durie, Samuel Durie's brother; Richard and Michael Fonner, William Fonner's brothers; Dr. Leslie Schwartz, William Fonner' psychologist; Nick Trujillo, Joe Herbert and Sylvia McGill, staff members at Essex House; and Ann Killalea, attorney for the defendants.
>
> I met Mr. Fonner on three occasions at Essex House where he lives in a group home with several other men. The house is a modest, brick rambler in an older section of Springfield, Virginia. Mr. Fonner is a very thin, 44-year old mentally retarded man, who is legally blind. He conversed easily but often repeated himself and frequently returned to matters previously discussed. He likes living at the Essex House and maintains a friendly relationship with the counselors.
>
> During each visit, Mr. Fonner and I first discussed various neutral topics, such as the Redskins, music and a recent trip to Pennsylvania. Our conversation were always pleasant and Mr. Fonner appeared comfortable talking to me. He usually held my hands while we talked.
>
> At our first meeting on October 28, 2002, Mr. Fonner became extremely anxious and began to cry when we discussed the pending lawsuit. He wanted his radio so he could listen to music to calm himself. As our conversation progressed, he remained upset and very child-like. He put his head on my lap, just like he did with his mother when they listened to music together.

Miss Tassi concluded that Fonner was "easily persuaded and his opinions parrot those he heard from others." She also concluded that Fon-

ner did not understand what a "lawsuit" is or what "civil rights" are. She also explained that Fonner "clearly stated" that he "does not want to meet Mr. [Harvey] Williams despite my efforts in assuring him that Mr. Williams is a nice person." In her opinion, Fonner had not knowingly authorized Mr. Williams to represent him. On this report the district court dismissed Fonner from the case. In our opinion, such dismissal was within its discretion.

Durie claims that the district court erred in granting the protective order preventing Durie from deposing Fonner. Durie argues that the defendants failed to show that the deposition would cause irreparable harm and that the district court should have allowed Durie to have his own medical expert examine Fonner before ruling on the motion.

"An order under Rule 26(c) is committed to the discretion of the trial court and will not be disturbed on appeal unless the court has abused its discretion." *M & M Medical Supplies & Serv., Inc.*, 981 F.2d at 163. Here, the magistrate judge's ruling, affirmed by the district court, relied on the report of Fonner's court-appointed guardian ad litem and the affidavit of Fonner's treating psychologist.

The guardian ad litem's report noted that Fonner is emotionally fragile and that his opinions and beliefs could be changed by the suggestions of others. Fonner's psychologist, Dr. Leslie Schwarz, stated that a deposition would cause Fonner to be "emotionally overwhelmed and traumatized." Dr. Schwarz also stated that "the negative effects of the deposition would likely trigger a relapse of previous symptoms and problematic behaviors" in Fonner and "greatly interfere with Fonner's functioning in daily life." Based on the report of the guardian ad litem and the affidavit of Dr. Schwarz, we hold that the district court did not abuse its discretion in affirming the protective order of the magistrate judge which quashed a subpoena for Fonner to testify.

## III.

We next address Durie's claim that the district court erred in granting summary judgment for the defendants on Durie's 42 U.S.C. § 1983 and Americans with Disabilities Act claims.

We first address Durie's claims under 42 U.S.C. § 1983 (1994). Durie claims that the defendants violated his constitutional rights of free association, substantive due process, procedural due process, and equal protection. All of these claims depend on a finding that Durie's relationship with Fonner is a protected liberty interest.

We first note that the restrictions did not prevent Durie and Fonner from spending time together. Durie was allowed to visit Fonner at Essex House, and Fonner could be picked up at the group home and taken to other locations, such as a restaurant for dinner. The restriction placed on Durie's ability to meet with Fonner was that Fonner could not visit Durie at Durie's home, at least as long as Miss Burnette, an employee and counselor of the county group home, also lived there.

The district court believed that the friendship of Fonner and Samuel Durie was merely the kind of "attenuated . . . personal attachment" which is not afforded Constitutional protection. See *Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1994); *Board of Directors v. Rotary Club*, 481 U.S. 537, 546 (1987). But even if it is, there is no evidence that any of the action of Fairfax County or its employees was aimed at Samuel Durie because he was incompetent or was aimed at incompetents in general. The restriction imposed was only that Fonner could not visit in Durie's home so long as Miss Burnett, who was a counselor at the county group home in which Fonner lived, also lived in the Durie home, which she did.

The decision by the defendants to restrict residents from the group home was made in response to an investigation by Mental Retardation Services warning that the professional relationship between staff and residents of the Essex House could be compromised if residents were allowed to visit staff member's homes. The need to maintain professional relationships between county staff and group home residents is a legitimate State interest. Therefore, even if Durie could establish that other similarly situated individuals were treated differently, the defendants' decision should be upheld as rationally related to a legitimate State interest. Accordingly, we hold that the district court did not err in granting summary judgment for the defendants on Durie's § 1983 claims.

Durie also argues that the district court erred in dismissing his claim that the defendants discriminated against him because of his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 (1995). The applicable portion of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1995). The district court granted summary judgment for the defendants on this claim because Durie "has never requested, applied for, or received any service from the County, nor has he ever been excluded from receiving services or participating in programs because of his disability."

Durie does not point to any facts that support his allegation that Durie was denied a benefit or service of a public entity. There is no evidence that Durie ever requested services or benefits from Essex House or Fairfax County, and no evidence that he was excluded from participating in any programs of Essex House or Fairfax County. Durie's only allegation is that the defendants prohibited Fonner, a resident of a county facility, from visiting Durie at Durie's home while Doris Burnette, a county employee and counselor, was also living there. This allegation is not sufficient to support a claim that Durie was denied the benefits of a service, program, or activity of a public entity, or subjected to discrimination by a public entity because of his disability.

Durie also argues that, even if he was not subjected to discrimination by the defendants, he has a claim under the ADA because of his association with Fonner. However, unlike the ADA sections relating to employers and places of public accommodation, the section applicable to public entities does not contain a specific provision authorizing liability based on association with a person with a disability.[1]

---

[1]The ADA prohibits an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual *because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.*" § 12112(b)(4) (1995) (emphasis added). The ADA prohibits a place of public accommodation from "ex-

Even assuming that such liability exists, however, Durie's argument misconstrues the purpose of association liability under the ADA.

Association liability applies when the plaintiff himself has been discriminated against because of his relationship or association with a disabled person. See *Tyndall v. National Educ. Centers, Inc. of Cal.*, 31 F.3d 209, 214 (4th Cir. 1994). Thus, Durie must still prove that he, not Fonner, was excluded from the benefits or services of the defendants or otherwise discriminated against by the defendants. As the district court correctly found, Durie has not produced evidence to support this claim. Accordingly, we hold that the district court did not err in granting summary judgment for the defendants on Durie's ADA claim.

IV.

For the reasons stated, we find that the district court did not err in dismissing William Fonner from the action, in granting a protective order preventing Fonner from being deposed, and likewise did not err in granting summary judgment for the defendants on Samuel Durie's 42 U.S.C. § 1983 and Americans with Disabilities Act claims. Accordingly, the judgment of the district court is

*AFFIRMED.*[2]

clud[ing] or otherwise deny[ing] equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity *because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.*" 42 U.S.C. § 12182(b)(1)(E) (1995) (emphasis added). The ADA section applicable to public entities, 42 U.S.C. § 12132, does not contain similar language.

[2]Durie's claim for emotional distress is also denied.